Honorable members of the court, I'm Monique Laxalt from Reno, Nevada here with Calvin Rx Dunlap, also from Reno, Nevada. Are you going to split the argument? No, I will do the argument, Your Honor. Honorable members of the court, this is a 1983 case involving a 13-year-old foster child, male, who was emotionally and behaviorally disabled at the time he was taken out of the family setting in December of 1996. Is disabled here a term of art or merely a lay descriptive term? I would say, no, Your Honor, he had actually been diagnosed as having multiple emotional and behavioral conditions. Yeah, that's different from being disabled. Yes, that's true, Your Honor. I think, yes, he had been diagnosed as having a multitude of behavioral and emotional disorders. Ms. Laxalt, let's stay on that point. Yes. In the Romeo case, Romeo versus Westbrook. Youngberg, yes. Youngberg, the person involved had some mental disabilities and was diagnosed as having mental disabilities. Yes. I take that to mean that the person could not determine for himself what to do volitionally. Let's concentrate on what evidence there was in the record that this young man, Earl Holden, had any volitional impediments. He may have had emotional distress. He may have had depression. He may have had post-traumatic syndrome. He may have had ADHD. There's a lot of evidence of that. All these issues go to his affect and his response in a psychological way. My question to you is, where is the evidence that there was a volitional disability so that the young man could not choose what he was going to do? I think, Your Honor, that in response to that, number one, he had been specifically recognized by defendant social worker Nancy Gamey as being sexually reactive. What does that mean as far as his ability to determine, to choose whether to engage in sex or not engage in sex? As I construe and would submit that the recognition of his status as sexually reactive as a result of having been abused as a child sexually. What does sexually reactive mean with respect of the ability of a person to choose to engage or not engage in sex? I think for a child of this age, 13 years old, as a matter of law, he was legally incapable of voluntarily engaging in a sexual act. No, he was unable to give consent to a sexual act. But was there some nervous or physical condition which impeded his being able to choose whether to engage in a sexual act or not? You say as a matter of law, a person under the age of consent is, quote, sexually reactive and therefore is not responsible for his acts when attacking a younger child? No, you can't mean that. No. First of all, your question, Your Honor, is. What does sexually reactive mean? It means that a child, in the context of a child, that a child lacks the normal ability to truly voluntarily decide whether or not to engage in the sexual act. Because he has gone through the experiences that give him this unusual and overwhelming urge to engage in the sexual act. And that is included in the technical term sexually reactive? Who testified to that content? No, there's no such testimony, Your Honor. I have no such. Are you using some sort of a medical dictionary to tell us what the term sexually reactive contains? Or is this just your interpretation of the term sexually reactive in the circumstances of this case? This was a term used by the social worker, Nancy Gammy. I'm not talking about the term. I'm talking about the content of the term. Right. Where do you get the content of the term that sexually reactive means lacks normal ability to clearly and voluntarily engage in sexual act? I took your note down, I think, correctly. All right. Where do you get that? Is that an assertion, an argument, or a definition? That's an assertion and an argument. All right. Okay. Got you. Let me ask it this way. In some ways, I'm quite sympathetic to your argument, and I'll lead into it by the following. We're all familiar, either by our direct experience or indirect experience, with the jobs that parents have to protect children and teenagers from their own proclivities. That is to say, we all think, or most of us think, it's quite a bad idea if we have a 15-year-old boy who's quite infatuated with a 15-year-old girl, for the parents to go away for the weekend, leaving them alone with the house to do whatever they're going to do in the house. And if the parents do go away, and if the 15-year-olds then engage in volitional acts that get them into trouble, I'll use an old-fashioned term, maybe I blame the 15-year-old, but I actually blame the parents even more. And in a sense, that's the situation we have here, translated into a more dramatic and sort of more difficult circumstance. You're saying, well, they should have known better than to put him into a situation where he would be tempted to do what he was likely to do. Having said that, where's your case law that helps you get to the point of attaching responsibility? I'm not even yet to the question of immunity. I can't find a cause of action for you, period. What case law helps you? The case law, Your Honor, establishes, commencing with the Youngberg v. Romeo case, that a person, and that concerned an adult, but a clearly mentally disabled adult, that a person in state custody, and that's critical in this case, Earl, being in state custody, did not have the ability to walk away. He was held by the state. A person in custody who has a mental disability, because Romeo had a mental disability, he had to be wrapped up to stop hurting himself. Yes. But I come back to the issue, where is the proof sufficient to allow a trier of fact to determine that Earl had a disability from engaging in sexual conduct? He couldn't restrain himself. We see the Youngberg case and the Greeson case where the mentally ill person committed suicide. Yes. There were determinations that the state had some duty. But is there any basis, or are there any cases, as Judge Fletcher was saying, that would show that a mental issue of the sort that Earl had, which seems far different than the Youngberg and Greeson case, would impose the same obligation to prevent self-harm as in those cases? Yes, Your Honor. I see this case very much analogous to the suicide case, the detainee and or prisoner suicide cases, including this Court's decision in Cabrales, where the Court found as to a pretrial detainee that signs that the detainee was mentally disturbed, even though he denied in that case that he had suicidal intention, that the state having that individual in custody had a duty to provide reasonable safety against his own acts to kill himself. And I would note that in that case, there was no quibble with the fact that, as Your Honor indicated, the question of voluntariness. I mean, it was never alleged or found that the acts of the decedent were not voluntary. But that case recognizes that the state's duty to provide reasonable safety to an individual in state custody extends to an obligation to protect him from harm to himself, and again, the obligation is reasonable safety. Let me ask you on that point. Yes. If this duty had been carried out, let's say there was a duty imposed on the state to recognize that Earl would attack Kevin Sloan. Yes. And they had recognized that earlier and with greater sensitivity. And they had taken Earl and moved him out of the Sloan house and put him into other treatment facilities, right? Yes. How would that have changed from what happened after he attacked Kevin? Wouldn't he have been in the same place? In other words, what damages? No, Your Honor. I think absolutely not. A huge distinction. If this had not happened, he would have been, first of all, if this had not happened, he would not have been placed with the Sloans, number one. He would not what? He would not have been placed with the Sloans. We're assuming that this placement did not occur. Is that correct? Mm-hmm. Okay. He would have been placed in a treatment center and more preferably under the system with foster parents without the company of small children, which Defendant Gowmey stated to the court was unsafe for him. He then would have received, first of all, in that setting, he would have had the benefit of foster parents throughout his adolescence. He was entitled to that. He would not have suffered the shame and humiliation of this calamity or the complete isolation that he endured throughout years of incarceration. So it's your belief that had they recognized his propensity, they could have placed him in a foster home without children, and that would have treated him as well as the treatment that he got after assaulting Kevin Sloan? Yes, Your Honor. Is there any evidence on that? Your Honor, I don't dispute the fact that after what happened happened, the calamity, Earl, he was, first of all, he was placed into the criminal system, and he was sent from the criminal juvenile detainment facility to mental institutions in Las Vegas, where he did receive sex offender therapy, and I believe that's the point you're making, Your Honor. No question about that. But wouldn't he have needed sex offender therapy if he had been caught in time before he seduced or sodomized Kevin Sloan? He would have needed that, wouldn't he? Yes, he needed that. Isn't that what he got? He got that, but he also got much, much more. What's the difference? He got, he was institutionalized, where, as you say, he could have gotten that treatment on an outpatient basis by having, being in a foster family without children. My question to you is, who's the doctor who test, who would testify, who did testify, and by declaration, that that would have been sufficient treatment for him? I mean, to raise an issue of factors for damages, right? Right. Well, and so first of all, I don't think we have any direct testimony, and it's undisputed. We don't dispute the fact that after the calamity, he received, needed therapeutic treatment in the institution. But what he also received was way more that was only negative. He suffered the, and the jury would make that finding. The jury would have full authority to make the finding that his time getting therapeutic treatment was not a damage. But there's much more that was horrendous damage. The shame, the terror of being interrogated and held prisoner, held in a jail. This is a 13-year-old child. The isolation and sense of being rejected by the foster placement where he had been. The years of detainment in the camp, the juvenile camp where he was made fun of. And felt isolated, never having a foster parent figure, any parent figure from the age of 13 until he reached adulthood. All of that was caused by this placement. I would ask to show it again to back up. I see this case as falling fully within, and I think the best analogy is the Cabrales case. Which was the pretrial detainee suicide. Only this is a child, and a child with recognized behavioral disorders and a past history of abuse. Could you briefly explain what evidence was available to the state before the Earl was placed with the Sloans that would show he would be a danger in that situation? Yes, Your Honor. To recap, Your Honor, Earl and his siblings were taken out of the home in December of 1996. On January 6th of 1997, the following month, defendant Nancy Gamme, the social worker assigned to the case, filed a report with the petition for custody filed with the court. Included her report that Earl's brother was sodomizing Earl, and that Earl had molested his cousin in 1994 and 1995. So this was beginning almost a full year, 11 months before this actual placement, she had that knowledge. On January 23rd of 1997, defendant Gamme was informed that Dorothy, the younger sister of Earl, had disclosed to her therapist that she was molested by her brothers. On March 24th, Dorothy's therapist informed defendant Gamme of Dorothy, again, the young sister, of her report that both brothers had had oral and vaginal intercourse with her. On July 23rd, 1997, defendant Gamme filed her first six-months report with the court. In that report, she stated that Earl's brother, James, had now disclosed that both he and his brother, Earl, had molested their sister and each other. At that point, the court entered an order that James and Earl both have sex offender-specific evaluations and follow through with the evaluator's recommendations. That was never done before Earl was placed in the home in December. And did a professional make a determination based on that evidence that it would be inappropriate to put him in a family with young children? I would, in response to that, Your Honor, I would say defendant Gamme herself reported to the court in early December that Earl was not safe with other children. She didn't disclose to the court that she had, in fact, several days before, placed him in a home, not only where he was with younger children, but where he was forced to share a bedroom with another young child, the young male child. So she herself made that determination that the placement was not safe. Both parties' experts in this case gave opinions that this was not safe. And that this placement, in light of Earl's known history, was not proper and fell below fundamental standards of professional judgment. You've used up all your time. Why don't we hear from the other side, and then we'll give you a chance to respond. Thank you. Also, Your Honor, I, on Friday, sent a letter, just one page, to the court requesting permission to cite supplemental authorities that have come down since on the issue of qualified immunity. And I don't know if that letter reached you. I doubt that it did. I don't yet have that letter. Did you cite the authorities in that letter? Yes. It will get to us. It often takes a minute to work its way to us. May it please the Court, I'm Andrea Nichols, on behalf of Appellee, the State of Nevada's Division of Child and Family Services, Nancy Gamme, and Fran Zito. With me at council table is Cynthia Peisel, who's a Chief Deputy Attorney General. And are you going to be sharing the argument? No, Your Honor. I'll be presenting the argument today. Thank you. I'm sure you've read the briefs. Briefly, we just have three main arguments. The first one being that this does not rise to the level of a constitutional violation. We agree that Youngberg was extended by the case of, I believe it's K.H. versus Murphy. The protections and the constitutional right to reasonable safety does extend to children in the foster care system. In this case, the facts do not rise to the level of a constitutional violation. Our second main point is that, in this case, the appellee, Earl, committed a bad act and should not profit or be all the damages flowed from his commission of a bad act and he should not be allowed to profit from the commission of a juvenile offense. Our third argument would be that even if you find that this rises to the level of a constitutional violation, Nancy Gamme and Fran Zito are entitled to qualified immunity because it would not have been clear to a reasonable person under the facts and situation of this particular case that they were clearly violating Earl's constitutional rights. And that, of course, stems from the fact that Earl had a right under the Constitution and under Federal laws such as CAPTA to be placed in the least restrictive environment. And that's your second point, that is to say that Earl should not be allowed to recover money because of a bad act that he did. I mean, we're familiar with that in all kinds of ways. I mean, it's the joke about, I killed my parents and now I want mercy because I'm an orphan. We're full of folk wisdom on that point, and it's clearly deeply embedded in our society. Partly I want to know what we might mean by bad acts. Now, there are some bad acts or acts that are forbidden by law or forbidden by moral structures that are so-called victimless, or to say the only victim is the person who does them. For example, there's in many instances a sort of a condemnation of suicide. That's a bad act. I think it's gone away a little bit, but there's a condemnation in many instances of masturbation and so on. I want to put to one side for the moment the victimhood of Kevin. I put it only to one side for the purpose of argument here, but what I'm after is trying to figure out what would be the circumstance if instead of a tendency and therefore a danger that he might engage in abusive sex toward a younger child, which he did. We had evidence not of that, but of a consistent practice of endangering himself with autoerotic asphyxiation. I don't bring this up just because and so on, but we had a case of this not too long ago. It's actually a fairly common thing. It's sort of an asphyxiation while masturbating, and it will sometimes result in death. Sometimes it results in death of sort of teenage boys. What if we knew, or rather what if your clients knew that this was a problem, that he'd done it before, and he knew that that behavior has a tendency to repeat, yet they had done not very much to prevent that from happening. Would he have a cause of action for having been put in an environment where it was not safe to him? The reason I say it this way is it is a volitional act. He derives pleasure from it. Nonetheless, it's very dangerous, and I'll assume for purposes of this hypothetical that in fact he kills himself, as sometimes happens. Is there a cause of action against your client in that circumstance? There may be, Your Honor. I think it depends on the exact facts and circumstances, whether they breached the duty to provide him with a safe environment, whether they erred on the side of caution, as they did in this case. But I leave it up to you to draw exactly where the bright line is. But it's interesting that you brought that point up, because I would like to talk about exactly what is in the record that Nancy Gamme and Franzito knew at the time. And we have in the record... Before we get to that for a moment, let's go back to see what was the circumstance into which he was placed. He was placed into a home with two children, one of whom was this, I think at that time, nine-year-old boy. And he was placed in the same bedroom with that nine-year-old boy. And given his circumstances, if all that was available to be known had been known at the time of that placement by those who did the placement, or had been known by the Sloan parents, I don't think anybody would have placed him in that bedroom. They probably would not have placed him in that home, because they're putting him in a situation where it's fairly likely they were going to get precisely this outcome. Now, you can argue, and it's a necessarily fair argument, well, but they didn't really know, or they didn't really know enough, or they really didn't know enough in time. But think under the circumstances. It was fairly predictable if they'd really, from things that were knowable... Yes, Your Honor, they say hindsight's 20-20. And I'm not here trying to attach blame. I'm merely trying to figure out sort of inevitable sequence, and what I'm trying to feed into is this notion of voluntariness. And I'm coming back in a sense, okay, I understand voluntariness, but I also understand 15-year-old kids, which is why I don't leave them alone for the weekend. Your Honor, you have to look at what they knew at the time. And if you look at the appellant's own complaint, which I submitted as supplemental excerpts of record, at page 1519, on December 19th of 1997, the foster parents took Earl to his appointment with the sexologist. The sexologist, again, indicated that as long as Earl was getting necessary treatment, they did not have to worry about the safety of their children. In fact, the sexologist's only concern was that they would spoil Earl too much. We know that Earl had been in a residential treatment center prior to even being removed from his parents' home. His diagnosis is in the excerpts of record submitted by appellants at page 261 and again at page 726. And I didn't bring it up here with me, but the diagnoses are that the things that they're worried about is his assaultive behavior, his post-traumatic stress disorder, but when he was in residential treatment prior to being placed in the Sloan's home, the sexual assault reactivity was not in the diagnosis. We also have, at the excerpts of record, page 1168, there was prior to the placement in the Sloan home, the team met. The Sloans were told about Earl's temper tantrums. Earl had two prior placements. When he was removed, after being removed from his parents' home, he was placed in a foster home where his temper tantrums and assaultive behavior led to him being removed. He was placed in an emergency shelter with Volunteers of America. At those two prior placements, there was not the sexual reactivity, the sexual acting out. They were really concerned with Earl's assaultive behavior, and that was the focus of the treatment. But at the same time, you can see with Franzito's treatment of Earl, she is trying to address the fact that Earl had been molested and that Earl could be a perpetrator himself. But that was not the focus. And then we also have... At page 374 of the excerpts of record, Earl's own testimony from his psychiatric evaluation, where Earl tells the foster child not to tell, the evaluator asks him, why did you tell him that? And Earl says, because I knew it was wrong and I didn't want him to tell. So we have a kind of a combination of what did they know at the time? They knew that Earl had some serious psychiatric issues. They had placed him in a regular foster home. That didn't work out, so he was up one level. He was in a therapeutic foster home. So what you're arguing is that there's insufficient evidence to find a breach of the duty. I think the question we have, at least one I have, is this. What is the scope of the duty? Who is to be protected by the rule that a person should be kept reasonably safe? Is it only Kevin? It's pretty clear that there's a duty to protect Kevin from Earl. But if we protect Kevin from Earl, do we have a similar duty to protect Earl from Earl? Your Honor, I think we do have a duty to protect Earl from hurting himself, but we don't have a duty to protect Earl from temptation. And I think that's almost where you kind of have to draw the line. I mean, if Earl is hitting himself or if Earl's banging his head on the wall, then we have to put a rubber mat on the wall so he doesn't hurt himself. But you can't quite mean it in the way you said it. Clearly you do have a duty to protect Earl from temptation. Let's do a different one. Let's say Earl is a young cocaine addict. I think you have a duty to keep cocaine out of his room. You're not supposed to put it on the windowsill. That is to say, you're not supposed to tempt him with cocaine. So you can't say in a blanket way you have no duty to protect him from temptation. The question is, what is the temptation? What's the degree of the temptation? What's the degree of harm that you risk by the temptation? But I don't think the categorical statement works. And then, Your Honor, then we get back to what the social workers knew at the time, what Earl's diagnosis was at the time. And I think I would agree with you, you don't put cocaine on the windowsill. But do you prevent the child from going to school where the kids are out back, you know, tempting him? And in this case... Should we go back to the scope of the duty? At what point does the duty to protect someone from a specific self-harm kick in? I mean, we've seen in Youngberg and Greeson that there were specific disabilities, and I think Judge Bea was using the term volitional self-control issues. What is the trigger for triggering that duty against self-harm? Is there any trigger, or would you have it whenever you have a child in custody? I don't think there is any bright-line test, but I think you have to look at the diagnosis, and I think you have to make reasonable efforts to treat the diagnosis while keeping the child in the least restrictive environment. We can't take children into foster care and institutionalize all of them and tie their hands behind their back. Isn't the trigger mental disability? Isn't that what Romeo was all about? And I would have to agree with Your Honor. Yes, but we have to look at what we knew about Earl's diagnosis. And here he was not necessarily mentally disabled. The expert who provided the report for the appellees in this case did note that Earl has average to above-average intelligence. We're not dealing with somebody who didn't know the nature and consequences of his own actions. To me, I was thinking it's almost like a chicken-and-egg argument, because the appellants would argue that Earl should have been institutionalized, but yet they're arguing that he was damaged because after he committed this offense he was institutionalized. So there's always the issue of damages. But your position is that there is no bright-line trigger that triggers the scope of the duty or enlarges the scope of the duty to prevent, to protect against self-harm. That it is always an issue of circumstances. If that's so, you lose, because the circumstances are the facts which a jury should evaluate. Well, Your Honor, I think I pointed to the diagnosis. Was it clear in Earl's diagnosis that he was at risk to this particular harm to himself? And I think when you have perhaps an inmate in custody who is clearly depressed you have a duty to take away their shoelaces and to take away their belt. In this case, in hindsight, this was not a good placement for Earl. But when you look at the diagnosis at the time, that was not clearly, clearly indicated. You have, as I said, you have a sexologist saying, to the parents, no, we think he's okay. You have a diagnosis that doesn't include the sexual reactivity. You have a treatment team, and that's at the excerpts of record, page 1106, discussing Earl's current problems. And really the current problems that they're focusing in on are his assaultive behavior and his temper tantrums. They do talk about the sexual acting out. He hadn't had any sexual acting out in his previous foster home. His brother James had admitted to it, but they didn't seem to think that it was something he was aware of, but they didn't think it was a current problem with Earl. So are you just saying it's the amount of knowledge that is available to the state? In other words, there's a duty to protect a child in custody that's in the state's custody from self-harm, the constitutional requirement at all times, and it's just the amount of knowledge that the state has with respect to the child's mental state or proclivities or whatever that would determine whether that duty was breached or not? Is that the theory you're suggesting? It's the diagnosis, it has to be the reasonableness under the circumstances, and it always has to be balanced with the duty to the issue of safety has to be balanced with the duty to place the child in the least restrictive environment. Here they're saying that Earl should have been, you should have known that he should have been institutionalized, but yet when you institutionalized him, he suffered harm. And who says whether the state did a good job or not? Because, I mean, that's basically what we're getting to in balancing those two issues. Is that a question for a jury or the court? I think that's a policy question, Your Honor, for the legislature. I think children that come into the foster care system are already, in a lot of instances, are already damaged. And we leave it up to the professional mental health providers and in compliance with legislative directives to do the best that we can with limited resources. And it's, I would never argue that the state is a good parent, but certainly some situations rise where the state has to step in and try to be a better parent for the child. And I would argue that the state is a better parent than the biological parents. I have two minutes if you have any other questions. I don't. I think not. Thank you very much. Ms. Laxalt, would you like a chance to respond? We'll give you the two minutes that we were just given by the other side. All right. Thank you very much. I think that listening to the arguments just presented by counsel, and specifically in response to the court's questions, it's very clear that this is a case that, in fact, should go to the jury. As I understood counsel, she admitted that it depends on the circumstances and it was her view that it depends on what was known and what the diagnosis was. In response to Your Honor's questioning, I went through the long list of documented instances where Defendant Nancy Gamme had noticed almost a year before of Earl's sexual proclivities. And furthermore, most critically, Defendant Gamme stated to the court two days, I believe, after the placement, that he was not safe with other children. How much more clear could it be that they knew, she said it was, that he was not safe with other children? But wasn't there evidence that the safety was related to the violence and the tantrums as opposed to, I mean, it wasn't clear what the lack of safety related to? Well, Your Honor, excuse me if I could grab the quote from the report to the court. In her report, she stated that, quote, Earl will not talk about the sexual acting out that he was involved in. And then she further stated on the next page, Earl has a history of sexual perpetrating on younger girls, but he does not remember it. Next sentence. He needs a great deal of therapy to be able to deal with this and to reach the point of being safe with other children. So I would submit, Your Honor, that the evidence, that that indicates clearly that she viewed him as not being safe sexually with other children. Now, you've used up your two minutes plus a little. If you've got one final sentence or two, we're quite happy to hear it. I also wanted to make the most important point is that Earl, and I think the court's analogy to the young cocaine addict is completely apt. He was actually forced to room into a room, imprisoned. He's in state custody, and then further, he's imprisoned in a room with the object of what they knew to be his temptation and a huge lack of safety. And he's in state custody, and so he's in a much greater likelihood of devastating harm. Thank you very much. We will take a five-minute break before we hear the next case, Vaught v. Scottsdale Health Care.
judges: Fletcher, Bea, Ikuta